UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Michael S. Kimm, Esq. (MK4476)
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Englewood Cliffs, NJ 07632
Tel: 201-569-2880
*Attorneys for plaintiff*

| | |
|---|---|
| HYUNJUNG KI,<br><br>                  Plaintiff,<br><br>   v.<br><br>CITY OF NEW YORK, DERMOT SHEA<br>AS NYPD COMMISSIONER, HYUN KIM,<br>in his individual and official capacity as a<br>NYPD officer, and JUNG KIM, individually<br>and in his official capacity as a NYPD officer,<br><br>               Defendants. | 20-CV-4343<br><br><br>Civil Action<br><br><br>**Second Amended Complaint**<br>**with Jury Demand** |

Plaintiff, for her second amended complaint against the above-named defendants, states:

## <u>INTRODUCTION</u>

1. This is an action for money damages arising from acts of gross recklessness by two officers of the New York City Department who violated plaintiff's civil rights under color of law and committed various related violations of law against plaintiff.

2. On October 8, 2019, defendant Hyun Kim, individually and in his official capacity, pointed a gun at plaintiff's head only two inches away from her face and held it there or shook the gun near her right ear while making verbal threats accompanied by incoherent,

1

incomprehensible utterances emphasizing his "New York Police Department" status, while the other defendant, his superior officer and NYPD Sargent  Jung Kim, watched in amusement and allowed Hyun Kim to continue misbehaving for a substantial amount of time and failed to curb the subordinate officer's criminal behavior.

## **THE PARTIES**

3. At all relevant times, plaintiff is an individual, female, and was a resident of Queens County, New York, at the relevant times.

4. At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of law and/or in compliance with the policies, official rules, regulations, laws, statutes, customs, usages and/or  practices of the State of New York and/or City of New York, to deprive plaintiff of her rights secured by the Constitution and the laws of United States and the State of New York, in direct violation of plaintiff's Constitutional rights to be free from official molestation, criminal acts, and other violations of law.

5. At all relevant times, defendant City of New York (hereinafter "CITY") is and was at all times relevant a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agents in the area of law enforcement and for which it is ultimately responsible. Defendant City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers. Defendant CITY was at all time relevant herein the public

employer of the individuals defendants Dermot Shea, Hyun Kim and Jung Kim.

6. At all relevant times, defendant officer Hyun Kim was a duly constituted police officer of the City of New York, whose residential address is unknown to plaintiff at this time. To the extent the City does not accept service of process on his behalf, plaintiff intends to effectuate service of process as soon as this defendant's address for service is obtained by discovery and/or by other methods.

7. At all relevant times, defendant officer and Sargent Jung Kim is an NYPD Police Officer believed to be based at the 115 th Precinct. This defendant is believed to have been a resident of the City of New York but his address is unknown to plaintiff at this time. To the extent the City does not accept service of process on his behalf, plaintiff intends to effectuate service of process as soon as this defendant's address for service is obtained by discovery and/or by other methods.

## JURISDICTION AND VENUE

8. This action arises under the Fourth and Fourteenth Amendments to the U.S. Constitution and federal statutory laws including 42 U.S.C.§§ 1983, 1988. The court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (a), as such plaintiff's state claims arise out of a common nucleus of operative facts.

9. Venue is proper in this District because significant events arose in this district in which all defendants participated.

10. Within the proper time allotted by statute, plaintiff filed a Notice of Claim with

City of New York, in accordance with the New York State Court of Claims Act §§ 10 and

11 and CPLR §215, as against each named New York City defendants. More than 90 days

have elapsed since the tort claims notice; plaintiff has been examined by defendants in

accordance with General Municipal Law section 50h; defendants have failed and refused to

pay compensation.

<u>**GENERAL ALLEGATIONS**</u>

11. On October 8, 2019, at approximately 10PM, two officers of the New York City

Police Department went drinking at the Apple Tree Café at 162 nd Street and Crocheron

Blvd., Flushing, New York, at a Korean-style karaoke bar.

12. On October 8, 2019, plaintiff began her first day of work at the Apple Tree Café

and was assigned as one of two servers for defendants Hyun Kim and Jung Kim who were

in plain clothes.

13. Apple Tree café has a basement that is divided into small rooms, which can seat

4 persons to several persons, depending upon the size of the rooms.  Defendants Hyun Kim

and Jung Kim occupied a small, private room, and ordered a full bottle of Johnny Walker

scotch with desserts and side dishes.  After some period of drinking, defendants allowed their

service pistols to be exposed and this caused plaintiff and the other server to be distressed

from the visibility of the guns.

14. Defendant Hyun Kim grabbed plaintiffs hand and arm, pulled them around his

waist, and forced her to feel his gun that was in its holster.   Plaintiff's co-worker, who was

4

also scared, asked whether they were gang members and defendants responded "no, we are police officers."  Defendants thus identified themselves as NYPD officers and led plaintiff to believe that they were acting in their official capacity as such and that they had full legal authority to do what they were doing.

15. At this point, defendant Hyun Kim asked plaintiff to in a co-worker named Jingo.  Plaintiff told him that it was her first day of work there and she did not know anyone, and said that she would go out to inquire who "Jinko" is, and tried to get up.  Defendant Hyun Kim forcibly pushed her down, prevented plaintiff's movement, and retrieved his gun.

16. Plaintiff's distress increased but she tried to remain calm and careful.  Although male servers and bussers came and went, defendant Hyun Kim did not mention "Jinko" to them.  One of the waiters attempted to guide plaintiff out of the room but defendant Hyun Kim prevented plaintiff from leaving her seat.

17. After some time, defendant Hyun Kim began to curse out loud and caused further distress to plaintiff and her co-worker and plaintiff's co-worker pleaded with defendant to "stop cursing."  The atmosphere in the room had soured.

18. Plaintiff and her co-workers attempted to remain calm but defendant Hyun Kim began to bang his gun on the table and kept saying the same thing over and over.  He said, "Do you know who I am?  Do you know me?  Sit still."  He repeatedly uttered "you fuckin bitch."  He kept saying "fuckin bitch," "fuckin bitch," "fuckin bitch" and the other officer who had come with him was just sitting there, not responding to his colleague's actions.

19. While defendant Hyun Kim banged his gun on the table, he pointed the gun down, and some of the bullets fell to the floor.  Plaintiff observed that two of the bullets fell and she picked up the bullets and said, "don't you get in trouble if you lose something like this?" and defendant Hyun Kim said, "No."

20. At this point, the Sargent went to the lavatory and plaintiff's co-worker was outside, so there were only plaintiff and defendant Hyun Kim at the table.  Defendant Hyun Kim said, " you know me, you fuckin bitch . . . ."

21. Plaintiff did not know what to do and was petrified with raw fear, and felt totally helpless and was convinced that she would be shot in her head.  She tried to calm defendant down and said "I'm sorry, just put the gun down."  After several minutes, the other officer returned, and plaintiff pleaded with him to have his colleague put the gun down and at this point defendant Jung Kim stated "as my subordinate officer I am ordering you to put the gun away" but defendant Hyun Kim failed to heed and defendant Sargent failed to exert any real control over his subordinate officer's ongoing violence.

22. Plaintiff coworker returned to the room and observed the gun being directed at the side of my head just as she was opening the door.  At this point, defendant Hyun Kim aimed the gun at her by the doorway and used the gun to order her to sit down.  "You come sit here with the gun," defendant Hyun Kim.  Plaintiff's co-worker, frightened, shut the door quickly and went away instead of coming in, and told the manager on duty to call the police.

23. Shortly thereafter, the owner and the manager went into the room, and are believed

to have told them that the police had been called.  Defendants left the Café premises shortly afterwards and could be seen outside the Café door on the sidewalk, talking between themselves, and one of the is believed to have dropped his gun.

24.  For two more days, plaintiff attempted to attend to work at the café but became unable to resume employment due to ongoing nightmares and fears of being killed at gunpoint by an NYPD police officer.  On October 10, 2019, plaintiff stopped working at Apple Tree café and became a recluse from her society including her friends.

25. After these events, plaintiff's life changed completely, dramatically and for the worse.  She found herself anxious all the time.  At nights, as she tries to sleep, her mind replays the events of October 8, 2019, like a broken recorded loop and causes her severe emotional distress from the belief that her life was to have ended that night.

## CLAIMS FOR RELIEF

### Count One – 42 U.S.C. § 1983

### False Arrest by Force

26.  The foregoing allegations are here incorporated by reference.

27.  Title 42 U.S. Code § 1983 - Civil action for deprivation of rights provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, . . . .

28.  Defendants committed acts of menacing, harassment, false arrest and forcible false arrest by using an NYPD-issue service gun to force plaintiff to remain in the room and in her seat against her will; by banging the gun on the table repeatedly; by dropping the bullets; by depriving her of her liberty, with the attendant acts described above.

29. Defendants' acts against plaintiff were malicious, deliberate, knowing, intentional, and/or recklessly in disregard with minimally civilized actions of a police officer and were clearly intended to cause abject fear and psychological injury or were in abject disregard for her rights to be free of unreasonable police violence and seizure under the Constitution and the law of the United States and laws of the State of New York.

30. Specifically, defendant Hyun Kim engaged in serious and harmful conduct by retrieving his service gun and threatening to use it upon a totally helpless civilian who committed no wrongful conduct other than providing café service upon defendant Hyun Kim.

31. At all relevant times, plaintiff was not engaged in the commission of any illegal act; was not told to be under arrest; was not actively resisting arrest or otherwise fighting with any of the officers/defendants.

32. Despite the foregoing, defendant Hyun Kim invoked his authority as an NYPD police officer, treated plaintiff like a criminal facing imminent arrest for an unknown conduct, and contemplated applying excessive force in reckless disregard for her safety, and thereby abused her constitutional rights to be left alone and in peace.

8

33. By reason of the above, plaintiff has been significantly injured both physically and psychologically.

## Count Two – 42 U.S.C. § 1983

## False Imprisonment

34. The foregoing allegations are here incorporated by reference.

35. Defendants falsely arrested and imprisoned plaintiff with no legal right to do so.

36. By reason of the above, plaintiff has been significantly injured both physically and psychologically.

## Count Three- 42 U.S.C. § 1983

## Fourth Amendment Seizure Violation

37. The foregoing allegations are here incorporated by reference.

38. By reason of those facts defendants violated the fourth amendment's prohibition of unreasonable searches and/or seizures. When plaintiff was prevented from moving away from inches of defendant Hyun Kim's service gun to her head, as he repeatedly stated that he was with the NYPD, and plaintiff was prevented from her freedom, the duration of the lack of freedom and conditions were such, under abject duress, that plaintiff's freedom was totally prevented by the threats.

39. Because her freedom was seized by defendant Hyun Kim, with this defendant's supervisor, a sergeant, in the immediate confines, the seizure was particularly offensive.

40.  By reason of this seizure, plaintiff has been significantly injured both physically and psychologically.

## Count Four – Negligent Hiring by City of New York

41. The foregoing allegations are here incorporated by reference.

42. The City of New York had a policy of hiring under which defendants were hired. At the time of each defendant's hiring, the City knew or had reason to know that each defendant was not a viable candidate for employment as a police officer and/or as a supervising office.

43.  By reason of the above, plaintiff has been significantly injured both physically and psychologically.

## Count Five – Negligent Training by City and Commissioner

44. The foregoing allegations are here incorporated by reference.

45. By reason of those facts, defendants engaged in negligent training of their law enforcement officials to behave properly while they are interacting with non-law violators.

46. By reason of the above, plaintiff has been significantly injured both physically and psychologically.

## Count Six – Negligent Supervision by City and Commissioner

47. The foregoing allegations are here incorporated by reference.

48. Defendants were under a duty to properly supervise their subordinate police officers.

49. Through a policy, custom, or practice defendants violated their duty to property supervise their officers and their officers, in turn, committed the acts described above.

50. The violations were reasonably foreseeable and totally preventable.  Defendants' failure to implement proper supervisory controls resulted in significant harm to plaintiff both physically and psychologically.

### Count Seven – Reckless or Negligent Infliction of Emotional Distress

51. The foregoing allegations are here incorporated by reference.

528**.** Defendants' unlawful, unconstitutional conduct, without justification, was extreme, outrageous, and utterly intolerable in a civilized community; conduct which exceeded all reasonable boundary of decency.  Defendants conduct was intended to and did cause severe emotional distress to plaintiffs.

53. Defendants knew or should have known that their conduct in menacing or harassing plaintiff would cause plaintiff significant emotional distress.  The actions and defendants and each of them were extreme and outrageous, beyond all possible bounds of decency.

54. By reason of the above, plaintiff has suffered significant injury both physically and psychologically.

### Count Eight – Menacing and/or Harassment

55. The foregoing allegations are here incorporated by reference.

56**.** By their conduct, defendants and each of them committed menacing and/or harassment in violation of plaintiff's rights.

57. Defendants knew or should have known that their conduct would cause plaintiff significant emotional distress.  The actions and defendants and each of them were extreme and outrageous, beyond all possible bounds of decency.

58. By reason of the above, plaintiff has suffered significant injury both physically and psychologically.

**Count Nine - Section 1983 <u>Monell</u> Claim Against NYPD/NYC**

59. The foregoing allegations are incorporated by reference.

60. To the extent not already stated above, plaintiff invokes <u>Monell v. Dept. of Social Servs.</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) to assert a direct Section 1983 claim against the New York Police Department and the City of New York.

61. The conceptual "use of force" as a lawfully authorized by policy is intended to be tempered by the conceptual lack of permission or policy support for the "use of excessive force" but in fact the use of excessive force and the wrongful use of force are authorized by official policy, custom, practices, and usages of the City of New York.  The NYPD policy permits each officer to engage in virtually any level of force on the officer's own judgment and therefore NYPD's policy effectively permitted the full range of behavior that was committed against plaintiff.

**NYPD'S EFFECTIVE POLICY AS TO SELF-REGULATION
OF "USE OF FORCE" CAUSES KNOWN, FORESEEABLE
ANTAGONISM, HARASSMENT AND UNDUE VIOLENCE**

62. The Eric Gardner choke-hold case on Staten Island revealed that an obvious case of unnecessary deadly force being applied would take 5 years for an administrative dismissal, to say nothing of criminal charges, because NYPD failed to have appropriate policy in place. The officer who committed the choke-hold killing defended his actions for five years as "enforcement of the law" when the underlying violation involved a pack of cigarettes that allegedly did not pay local tobacco-tax.

63.  In the aftermath of the Eric Garner case, New York City Local Law No. 129 of 2016, mandates the New York City Police Department to publish the Patrol Guide online for the public to view.  Prior to 2016, the Police Guide and related policy manuals were not required to be made available to the public.  The Patrol Guide exists in 3 volumes, two of which are labeled "PATROL GUIDE," intended to be applied to patrol settings, and one is labeled "ADMINISTRATIVE GUIDE," intended to apply to administrative matters within the police department.  While these guides are applied as "policies," in fact, as shown below, the NYPD's policies are essentially "up to the individual officer(s)" in any given situation.

64. In the aftermath of that 2014 choke-hold death case, the NYC Department of Investigation's Office of Inspector General released a report (the Use of Force Report) on NYPD's use of force policy.  "This Report examines five aspects of use of force within NYPD: (1) trends; (2) reporting;  (3) de-escalation; (4) training; and (5) discipline.  The

13

Report begins by highlighting data and trends from excessive or unnecessary force cases substantiated by the Civilian Complaint Review Board (CCRB)." See Use of Force Report, at 1.

65. In advance of the Inspector General's report, the City studied NYPD's use of force policies, practices, training, and discipline, which was the first of its kind. See https://www.nyc.gov/html/oignypd/assets/downloads/pdf/oig_nypd_use_of_force_report_-_oct_1_2015.pdf. The study, "Police Use of Force in New York City:  Findings and Recommendations on NYPD's Policies and Practices" (the "Policies & Practices Report") identified systemic problems that effectively became standard "policies and practices" in police conduct:

> **NYPD's current use-of-force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force**. NYPD's current use-of-force Patrol Guide procedure, which is barely more than a page of text, is completely silent on what actions constitute "force." The Patrol Guide likewise prohibits "excessive force" while offering no clarity on what constitutes "excessive force." Officers are given few clear-cut rules when determining whether their actions constitute force and whether such actions must be reported. As a result, NYPD should adopt a more precise use-of-force Patrol Guide procedure that includes greater clarity on what is meant by "force," "excessive force," and "deadly physical force."

> **NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter**. The lack of a centralized, uniform use-of-force reporting mechanism leaves officers without guidance about reporting force and NYPD without adequate data regarding police officer use of force. It is currently impossible to accurately and comprehensively track the use of force by NYPD officers. As a result, NYPD should revise its use-of-force policy to create a new reporting

14

form that requires officers to capture all incidents of force  using descriptive
language.

Policies & Practices Report at 3.

66. With a police force larger than some national militaries, and by far the largest in
the United States, it is shocking that NYPD has failed to define and contextualize force and
the use of force, excessive force, and unreasonable force, in applications.  By its deliberate
omission policy, NYPD has operated a policy of conferring unlimited authority to each
officer to define for himself or herself how "force" and "excessive force" are to be
understood and applied in every day setting, and thereby enabled the officers to decide
whether or not to use force for any reason or no reason.  This unlimited force/use policy has
enabled each officer to decide whether the officer is actually implementing what would be
systemically understood to be improper or inappropriate.  If the use of excessive force is not
understood to be unlawful or improper, how would any officer realize that the attempted or
threatened, or even "playing around" with the seeming use of force, under any circumstance,
would be improper.

67. NYPD and therefore NYC has operated under a policy and practice of allowing
each officer to determine whether and how to de-escalate any situation or to engage in
antagonistic or offensive conduct in relation to the public.  This is fairly inferred from the
abject lack of policy and training on de-escalation of tension:

     **NYPD's Patrol Guide does not properly instruct officers to
de-escalate encounters  with the public**.  Considering NYPD's stated
commitment to de-escalation training,  the overall benefits of such strategies

15

in policing, and the strides that have been  made in updating the policies of peer law enforcement agencies, the Department  should include de-escalation principles as part of its use-of-force procedures in the  Patrol Guide.

**NYPD training does not adequately focus on de-escalation**.  There is little to no  substantive focus on de-escalation in NYPD's training programs. The Department  should bolster its efforts to train officers in de-escalation and do more to reinforce  its importance.  NYPD should add a specific Police Academy course on de-escalation  and incorporate such tactics more heavily in its classroom and practical training  environments.

Policies & Practices Report at 3.

68. NYPD adopts the U.S. Department of Justice's understanding of "de-escalation"

and explains:

### V. Force De-Escalation Policies and Practices in NYPD

As recognized in New York City and across the nation, de-escalation policies and tactics have the potential to greatly mitigate the use of excessive force by police officers.  De-escalation tactics have a proven track record of not only limiting force, but also ensuring officer safety.  As recently summarized by the U.S. Department of Justice:

De-escalation more broadly refers to the strategic slowing down of an incident in a manner that allows officers more time, distance, space and tactical flexibility during dynamic situations on the street.  Applying these specific skills increases the potential for resolving the situation with minimized force or no force at all, which reduces the likelihood of injury to the public, increases officer safety and mitigates the immediacy of potential or ongoing threats.  A reduction in use-of-force incidents also reduces community complaints, promotes the perception of procedural justice and, most importantly, promotes resolution of events with the public's compliance.[45]

OIG-NYPD's investigation suggests that NYPD officers rarely use de-escalation and that the Department's policies and training currently do not adequately address de-escalation as a useful tactic for officers in the field.  As

previously mentioned, NYPD is currently contemplating potential revisions to
its de-escalation policies and procedures.

Policies & Practices Report at 28.

69. Rather than teaching and fostering a strong policy of de-escalation, NYPD has
effectively permitted its officers to determine and define, on their own, whether any
interaction with the public warrants de-escalation to any degree and if so how to achieve de-
escalation. Thus, NYPD has operated under an effective policy of situational de-escalation.
By operating with such a policy, NYPD has enabled individual officers not only to de-
escalate on their own judgment but to escalate on their own judgment as well. Under this
situational policy, it is entirely foreseeable, and all to predictable, that an officer would think
that brandishing or even pointing his service gun at anything, or anyone, would be within
their authority because, as some characters in older Westerns used to say, "I am the law."
In the same vein, a superior officer would be entirely within "policy" by permitting a
subordinate officer's brandishing of a service weapon or "toying with it" as a mere
"professional comedy" with abject disregard for the shock and distress that would be caused
upon the victim.

70. NYPD has known of cases of its officers engaging in <u>unwarranted escalation</u> of
force involving totally  passive conduct by members of the public including this example
underscored in the Policies & Practices Report at 29-30:

**Substantiated CCRB Case Study: Could De-Escalation Tactics Have Been
Used to Prevent a Force Encounter?**

17

At approximately 2:40 a.m. in Manhattan, a 45-year-old male complainant walked out of his apartment to take out the trash and locked himself out of the building.

In the video footage of the encounter, the man can be seen speaking to two officers as he attempts to explain his predicament. The subject officer walks away toward the entrance of the apartment building as the complainant continues speaking with the second officer. The man is visibly frustrated by the situation and is waving his hands around as he speaks.

According to the CCRB investigative report, the subject officer stated that he smelled alcohol on the complainant's breath and did not believe that he was a resident of the building. When the officers asked the man for identification, he replied that he did not have it. The man further stated that he had locked himself out of his apartment. The subject officer told the complainant that he could not enter the building and that he had to leave because he did not have identification. The subject officer told CCRB that he then asked the complainant to leave three times, and that each time the man responded that he lived in the building.

The video shows the complainant and the subject officer in a heated conversation when the subject officer begins yelling and pointing his finger in the man's face. The subject officer then aggressively pushes the complainant to the ground. The subject officer walks over to the complainant while he is lying on the ground and continues to yell and point his finger at him.

The second officer failed to intervene when the subject officer initially lost his temper and stood several feet away with his hands in his pockets. The second officer remained passive and did nothing to intervene or take control of the situation, even once the complainant was on the ground and the subject officer continued to yell at him.

71. With no policy or educational training or practice guidance on de-escalation and avoidance of unwarranted antagonism, how would NYPD determine that the conduct displayed in the foregoing example was "wrong" or "contrary to policy"?  Not only would it be difficult or impossible to do so, the conduct was actually authorized by NYPD's open

18

policy for officers to assess and act on their own.  Just as NYPD policy effectively primed that officer to "pick a fight" with the resident who had the misfortune of being locked out of his own residential building, which is not even a crime, smelling of alcohol, which is not a crime, plaintiff's mere existence, as perceived by the officer who was present "on the scene" and determined his own conduct, his level of engagement, resulted in the offensive retrieval of the service weapon with no reason to do so, and pointing point-blank, with a magazine full of live bullet rounds, it upon the head of the civilian because, "he could."

72. Just as the second officer in the quoted case remained "passive and did nothing to take control of the situation," the second officer in our case, a Sergeant at that, thought it was amusing to see a civilian facing a point-blank aim with a service gun while the holder of the weapon spat incoherent words and phrases at the victim, and thus the "second officer" not only looked at the situation but made light of the situation with his failure to take control of the situation.

73.  The Policies & Practices Report shows further cases of "force escalated by officer," in case after case involving civilians who are doing nothing other than merely existing and occupying air space.  With no discernable reason or justification, and certainly with no crime being committed in the officers' presence, NYPD has long known of its officers initiating unreasonable force that ultimately is applied to a situation that did not need any.  Another example involves a 15 year old minor:

Substantiated CCRB Case Study: Could De-Escalation Tactics Have Been Used to Prevent a Force Encounter?

At approximately 12:50 a.m. in Manhattan, a 15-year-old male complainant was walking on the sidewalk when he was approached by two officers.

In the audio recording of the encounter, the subject officer initially appears to be the only person speaking to the boy. Moments later, however, a second officer also engages the complainant. The boy protests having been stopped and mentions that the stop was his second in just two blocks.

According to the CCRB investigative report, the subject officer searched the complainant. When the boy objected that there was no cause for the stop, the subject officer asked him to stop using derogatory language and informed him that if he did not comply, he would be arrested.

The audio indicates that the complainant and the subject officer are engaged in a heated conversation during which the subject officer is taking exception to the boy protesting the rationale for the stop. Each time the complainant speaks, it appears to intensify the ensuing verbal responses of both officers. A scuffle ensues between the subject officer and the boy which results in the subject officer pushing him repeatedly.

CCRB substantiated the force allegation against the subject officer, but he ultimately received no discipline

Policies & Practices Report at 30.

74. NYPD referenced the following case as involving "force escalated by officer" but it was actually not merely escalated but manufactured by the officer:

Substantiated CCRB Case Study: Force Escalated by Officer

At approximately 10:30 p.m. in Queens, a male complainant was standing outside a shopping center with a second male complainant and another man when the first complainant interacted with an off-duty officer who was entering the premises.

In the video footage of the encounter, the first complainant is seen standing outside the shopping center when the off-duty subject officer approaches and appears to lightly shove his way through the path of the complainants and the other man. As the officer enters the shopping center, the

first complainant can be seen standing outside making a hand gesture with his arms stretched out at his sides to reflect that he was upset by the subject officer's shove.  A clear exchange of words ensues between the first complainant and the subject officer.  As the exchange continues, the subject officer can be seen turning around and walking back towards the door of the shopping center to confront the first complainant.  While doing so, the subject officer lifts his shirt to reveal his shield and service weapon and unclips an object from the waistband of his shorts.  When the subject officer approaches the first complainant, he pushes the first complainant with two hands, causing him to move several feet back.  Additionally, the subject officer strikes the second complainant with the object in his right hand.  The subject officer is then seen walking away from the men and re-enters the shopping center.

According to the CCRB investigative report, the subject officer believed that the men standing in front of the shopping center appeared suspicious and were blocking the entrance. The subject officer denied pushing the first complainant and told CCRB that as he attempted to enter, the first complainant advanced in his direction.  As a result, the subject officer stretched his arms out to keep him at a distance.

CCRB substantiated the two force allegations against the subject officer.  At the time of the writing of this Report, no disciplinary decision has been reached in this case despite the matter being in the NYPD disciplinary process for the past 20 months.

75. After referencing a small handful of other sample cases, see 30-33, the Policies & Practices Report observes: "As these examples show, NYPD officers are not only missing opportunities to de-escalate, but are sometimes actively escalating situations with members of the public, thereby suggesting that the Department may not effectively promote the use of de-escalation tactics in the field.  The solution to this issue lies in both policy and training." While this appears to acknowledge a problem, in fact NYPD is still not dealing with reality in that these situations did not implicate the need to de-escalate at all; rather, these situations required the officers involved not to manufacture the force/situation at all.

76. The Policies & Practices Report uses taming words to summarize the flagrantly-improper acts as "lost opportunities" at de-escalation, rather than teaching officers that these situations are plainly and simply "wrong and unlawful," but the Policies & Practices Report amply reveals that NYPD's policy of situational policing ("I am the law") is the policy responsible for such injury to the public.

## NYPD'S STATED POLICY AS TO "USE OF FORCE" ACTUALLY AUTHORIZED DEFENDANTS' CONDUCT

77. NYPD's policy on initiation or manufacture of gratuitous force is: "It's up to you, the individual officers to use whatever force you see fit."  This policy is admitted by NYPD itself:

### i. NYPD Patrol Guide Does Not Define "Force" or Establish Levels of Force

Tracking the use of force by police officers first requires defining what is meant by "force," "excessive force," and "deadly force."  When a police department provides clear and practical definitions of such terms, officers have a better understanding of what is expected of them, and communities have a better understanding of what to expect from law enforcement.  As previously established, the authority to use force to address a situation is one of the greatest powers that society gives to law enforcement and the exercise of that power can have serious consequences.  Accordingly, law enforcement and communities alike must have a consistent understanding of what is meant by "force."

The NYPD Patrol Guide contains no definition of "force."  While Patrol Guide §203-11 provides broad principles declaring that force must be limited to what is necessary under the circumstances, the guide does not clarify what actions constitute force.  Likewise, although Patrol Guide §203-11 states in highlighted language that "EXCESSIVE FORCE WILL NOT BE TOLERATED," it does not define or clarify what is meant by "excessive force."  Finally, while the Patrol Guide contains a separate section on "Deadly

Physical Force" with clear, delineated instructions on when deadly force is permitted and when firearms use is prohibited, §203-12 does not define what constitutes "deadly physical force."[28]

* * *

Moreover, NYPD has recognized the importance of officers understanding "force" and related terms.  Through its various use-of-force training materials, NYPD already defines "deadly physical force" as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury."[30] The lesson plans likewise stress the importance of trainees being able to "define physical force, deadly physical force, physical injury, [and] serious physical injury."[31]

Notably, other police departments include definitions of such terms in their operations materials. . . .

78. Indeed, the "Patrol Guide" is silent about the duty to refrain from initiating or manufacturing force or (toying with it) where none is required or triggered by external circumstances; silent about initiating or even out right manufacturing any force against civilians whose only fault is to exist and occupy air space in front of the officer(s); silent about the duty to be responsible with the "retrieval" of the service weapon from its holster.

79. NYPD's policy in this regard is so situational so non-existent that it is tantamount to the policy of individual officer's whim.

80. While it should be the very first principle of policing education that civilians who are not suspected of crime should be left alone, as their right of liberty suggests, the right of liberty is somehow subsumed by the officer(s)' situational whim.

81. Even in its self-critical study, NYPD discusses the need to train de-escalation but does not advocate the need to train the police to leave civilians alone unless and until they are suspected of the commission of crime:

### b. NYPD's De-Escalation Policies: Areas for Improvement

Core to any de-escalation program is the de-escalation policy.  In addition to training and promoting a culture around de-escalation, a clearly written policy is needed to inform members of a police department of the rules, parameters, and principles that guide police officer conduct during encounters with the public.  Written policies have the opportunity not only to inform officers about the role and benefits of de-escalation in such encounters, but also to educate officers on specific de-escalation tools and tactics.47

### i. NYPD Patrol Guide

While NYPD has recently refocused its efforts on providing officers with de-escalation training, the NYPD Patrol Guide remains relatively silent on de-escalation tools and on an officer's responsibility with respect to de-escalation tactics.

As noted above, the core use-of-force provision of the Patrol Guide requires that officers use only the amount of force necessary to address the situation.  Patrol Guide §203-11 stresses that officers only "use minimum necessary force" and "[e]mploy non-lethal alternatives, as appropriate." Patrol Guide §203-11 also includes prohibitions against certain forms of excessive force, such as chokeholds, conduct that may result in chest compressions, and dangerous forms of restraint.  Consistent with these prohibitions, the Patrol Guide notes that "[m]embers of service are required to maintain control or intervene if the use of force against a subject clearly becomes excessive."[48]

The Patrol Guide articulates a policy on the need for the application of force to be proportional to the circumstances and imposes an affirmative duty on officers to prevent the unnecessary escalation of force when it appears excessive.  However, it does not articulate a policy on the importance of reducing [OR AVOIDING ALTOGETHER] the likelihood that force is needed in a given situation.

24

Policies & Practices Report at 34.

### NYPD'S POLICY OF NON-DISCIPLINE CONTRIBUTES TO SITUATIONAL, UNNECESSARY "ESCALATION" OF FORCE

82. Where, unnecessary force is used or displayed, the corollary question is whether the officer(s) involved were disciplined, and the answer is no, with rare exceptions. It took a world-televised case of excessive force, the Eric Gardner choke-hold kill, for NYPD to initiate a "study" at all. The Policies & Practices Report frankly admits the woeful lack of discipline upon the transgressors:

> **In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force**. NYPD imposed no discipline with respect to 37 of 104, or 35.6%, of substantiated allegations in which OIG-NYPD's independent review confirmed that officers used excessive force that was not warranted under the circumstances. For those cases decided in the four years between 2010 and 2013, NYPD declined to impose discipline in 34 of 77 allegations, or 44.1% of the time. NYPD, however, declined discipline in three of 27 allegations, or 11.1% of the time, in the cases decided in 2014 and 2015. Although the rate is trending downward, given the small number of data points since January 2014, OIG-NYPD will continue to monitor the issue.

> **NYPD and CCRB continue to disagree on how officers should be held accountable for use of excessive force, but the two agencies have taken steps towards harmonizing disciplinary results and improving agency cooperation**. Across 92 substantiated use-of-force allegations, NYPD departed downward from CCRB's disciplinary recommendations—or imposed no disciplinary action whatsoever—67.4% of the time.2 A review of the NYPD's disciplinary decisions since January 2014 indicates that the rate of disciplinary downgrading in use-of-force cases has recently slowed. Of the 20 disciplinary determinations reviewed during this period, NYPD imposed a lesser or no penalty in four instances, or 20.0% of the time. Nevertheless, the gulf between CCRB and NYPD remains. These findings show that the dissonance between NYPD and CCRB observed in OIG-NYPD's Chokehold Report is part of a larger pattern of incongruous disciplinary decisions. In

recent years, however, a number of changes have been made regarding how NYPD and CCRB interact. Among these developments is the reconsideration process whereby NYPD can request that CCRB re-review a determination or penalty recommendation. Since the reconsideration process went into effect in December 2014, rather than depart downward from CCRB's disciplinary recommendations, NYPD has sent cases back to CCRB to be reviewed again. OIG-NYPD has not yet reviewed the full effects of the new reconsideration process.

83. While the career police administrators debate with the civilian control board, basic issues such as "initiation of undue force" are left idle. Procedure No. 304-06 purports to set forth "PROHIBITED CONDUCT" and contains the following principles and policies (which need not be read in their entirety, as they are missing the single most important principle and policy of prohibition, initiation of undue force including the retrieval of the service weapon):

1. Engaging in conduct prejudicial to good order, efficiency, or discipline of the Department.

2. Using discourteous or disrespectful remarks regarding another person's age, ethnicity, race, religion, gender, gender identity/expression, sexual orientation, or disability.

    a. Members shall address the public using pronouns, titles of respect, and preferred name appropriate to the individual's gender identity/expression as expressed by the individual.

    b. The term "gender" shall include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

3. Consuming any amount of intoxicants while on duty whether in uniform or civilian clothes.

a. Member assigned to duty in civilian clothes may be granted permission by the bureau chief/counterpart concerned based upon the nature of the member's assignment.

4. Bringing or permitting an intoxicant to be brought into a Department building, facility, booth, boat, or vehicle, except in performance of police duty.

5. Entering premises serving intoxicants, except for meal, personal necessity, or performance of duty.

6. Knowingly associate with any person or organization:

a. Advocating hatred, oppression, or prejudice based on race, religion, gender, gender identity/expression, sexual orientation, or disability.

b. Disseminating defamatory material.

c. Reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities.

d. Preventing or interfering with performance of police duty.

7. Divulging of discussing official Department business, except as authorized.

8. Discussing substance of a pending case ex parte (e.g., elected officials, community advocates, members of the press, members of the public, attorneys, representatives, relatives, etc.).

a. This prohibition also applies to the Department Advocate's Office during the pre-charge stage, as it has prosecutorial discretion in determining whether to serve charges, and what penalty to seek.

(1) Pre-decision letters (i.e., a letter of support, character letter, etc.) may be submitted to the Department Advocate's Office and Civilian Complaint Review Board, as appropriate, with a copy forwarded to the First Deputy Commissioner.

b. Questions pertaining to the disciplinary process (e.g., timing, scheduling, etc.,) may be referred to the Deputy Commissioner, Trials,

Department Advocate's Office, or the Civilian Complaint Review Board, as appropriate.

c. Post-trial negotiations may be authorized by the Police Commissioner, as appropriate.

9. Participating in the Department disciplinary process, or its investigatory process, when there is a familial (e.g., spouse, child, present or past romantic relationship, etc.), or personal (e.g., friend, neighbor, business/financial, close colleague, etc.) relationship, or any other relationship with the respondent that could create, or appear to create, a conflict of interest.

a. Notify commanding officer or executive officer, immediately, if a familial or personal relationship is discovered, which may require recusal from participation in a particular case.

(1) If uncertainty exists as to whether recusal is appropriate, member concerned should consult with the Legal Bureau.

(2) Commanding officer or executive officer will notify their bureau chief or deputy commissioner immediately, if a familial or personal relationship requires recusal.

10. Manipulating manually or electronically, transmitting in any form, or distributing any official Department recorded media or recorded media coming into possession of the Department as evidence, or for investigative purposes, except as authorized for official Department business.

a. Recorded media includes videotapes, photographic images or pictures, audio recordings, electronic or internet files, or any like forms to be available in the future.

11. Making recommendation for or concerning any person or premises to any government agency in connection with issuance, revocation, or suspension of any license or permit, except when required in performance of duty.

12. Engaging in card games or other games of chance in a Department facility.

13. Joining any political club within the precinct to which assigned.

28

14. Soliciting, collecting, or receiving money for any political fund, club, association, society, or committee, unless approved by Internal Affairs Bureau.

15. While on duty, endorsing political candidates or publicly expressing personal views and opinions concerning the merits of:

>    a. Any political party or candidate for public office;

>    b. Any public policy matter or legislation pending before any government body; or

>    c. Any matter to be decided by a public election, except with the permission of the Police Commissioner.

>    d. Voting on any matter that comes before the community board concerning Police Department activities in the district that the board serves.

16. Being a candidate for election to, or serving as member of a School Board, if School District is located within City of New York (see Section 2103-a, Education Law).

17. Serving on a community board's Public Safety Committee (which deals directly with Police Department and other law enforcement matters).

18. Violating Section 1129 of the New York City Charter. This section provides that any uniformed member who shall accept any additional place of public trust or civil emolument, OR who shall be nominated for any office elective by the people, and does not decline said nomination within ten days, shall be deemed thereby to have vacated his or her position/office in the Department. This shall not apply to the following:

>    a. A member of a community board

>    b. An appointment, nomination, or election to a board of education outside the City of New York

>    c. A member, who with the written authorization of the Mayor, shall accept any additional place of public trust or civil emolument, while on leave of absence without pay from the Department.

    d. A member who, with the written approval of the Deputy Commissioner, Legal Matters, shall accept any additional place or position outside the City of New York, limited to volunteer work as a member or volunteer in, of, or for a community board, not-for-profit corporation, volunteer fire department, or other similar community-oriented entity.

19. Occupying seat in a public conveyance, while in uniform.

20. Rendering any service for private interest, which interferes with proper performance of duty.

21. Recommending use of particular business, professional or commercial service to anyone except when transacting personal affairs.

22. Steering business, professional or commercial persons to a prospective client requiring such services except when transacting personal affairs.

23. Consenting to payment by anyone to regain lost or stolen property or advising such payment, except towing fees as provided by law for recovered stolen vehicles.

24. Having any person make a request or recommendation that affects the duties of any member of the service, except as provided by Department procedures.

25. Failing to provide notice to the Department of an obligation or intention to perform services in any federal military branch.

26. Carrying a package, umbrella, cane, etc., while in uniform, except in performance of duty.

27. Possessing or displaying police shield, IDENTIFICATION CARD (PD416-091), Department logo, or similar object except as authorized by the Police Commissioner.

28. Using Department letterhead, personnel, equipment, resources, or supplies for any non-Department purpose or non-city purpose.

29. Making an unauthorized radio transmission.

30. Reporting for duty and/or end of tour via "outside wire" on a regular basis.

a. Members will not report for duty and/or end of tour within their precinct of residence unless approved by their commanding officer.

ADDITIONAL
DATA        Members of the service are reminded that their conduct, on or off duty, is subject to scrutiny. [Emphasis added.]

84. That the City failed to implement a simple policy prohibiting the "gratuitous retrieval of a service weapon" or the "creation of a situation to deploy force" or related matters is shocking because such policies are so obviously necessary at NYPD.

85. In an excessive force/false arrest case filed long before the Eric Gardner case, and long before the NYPD's self-study was commissioned or made public, in a 2009 case, Judge Weinstein's analysis warrants heeding.  In Colon v. City of N.Y., No. 09-CV-8, 2009 U.S. Dist. LEXIS 110520 at *3-5 (E.D.N.Y. Nov. 25, 2009) Judge Weinstein addressed several types of constitutional violations that would paint the picture of a "rogue cop" behaviors:

The City is said to be liable under section 1983 for the Colons' injuries, pursuant to Monell v. Dept. of Social Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), because the acts complained of were the result of the "customs, policies, usages, practices, procedures,  [*3] and rules" of the City. Complaints P 83. The following are alleged to be City customs or policies:

  (a) wrongfully arresting minority individuals on the pretext that they were involved in drug transactions;

  (b) manufacturing evidence against individuals allegedly involved in drug transactions;

  (c) using excessive force on individuals who have already been handcuffed;

  (d) unlawfully strip-searching pre-arraignment detainees in the absence of any reasonable suspicion that said individuals were concealing weapons or contraband; and

(e) arresting innocent persons in order to meet "productivity goals" (i.e. arrest quotas).

Complaints P 84. The Colons assert that such customs and policies may be inferred from the existence of other similar civil rights actions that have been brought against the city, Complaints P 85 (listing example cases), and from a January 2006 statement by Deputy Commissioner Paul J. Browne that police commanders are permitted to set "productivity goals," Complaints P 86.

In support of its motion to dismiss, the City argues that the Colons fail to identify any actual custom or policy of the city, and that their allegations are too speculative and inconclusive to meet the pleading   [*4] standard established in <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Absent a viable federal claim against the City, the court is urged to decline supplemental jurisdiction over the Colons' state-law claims with respect to the City.

"[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." <u>Iqbal</u>, 129 S. Ct. at 1940 (<u>citing</u> <u>Twombly</u>, 550 U.S. at 556). Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration--through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department--<u>there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city [*5] approving illegal conduct of the kind now charged</u>. [Emphasis added.]

It would be desirable to quantify this general reputation, but such quantification is beyond the scope and capacity of the court on this motion. Upon inquiry at oral argument, neither party was able adequately to address what documentation may exist supporting or refuting the existence of such a policy or custom. See Nov. 25, 2009 Hr'g Tr. at 6:14-8:16, 9:21-11:6. Nevertheless, there are substantial issues: first, whether this reputation is predicated on a significant number of misstatements by police officers--even

though the overwhelming majority of the police force does not engage in such fabrications; and, second, whether failure to train, supervise, or discipline members of the police force that do commit such fabrications constitutes a policy or custom under <u>Monell</u>. <u>See, e.g.</u>, <u>Walker v. City of New York</u>, 974 F.2d 293 (2d Cir. 1992). While the charge may prove to be completely unfair to the city and its generally outstanding police force, there are sufficient issues of fact to warrant further proceedings under <u>Monell</u>. Neither <u>Twombly</u> nor <u>Iqbal</u> can trump the Constitution.

86. In a post-Gardner case, Judge Weinstein would have commented not merely that "<u>there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city  approving illegal conduct of the kind now charged</u>[]; rather Judge Weinstein would certainly hold that the evidence of policy, custom, practice of the City authorizing each officer's application and degree of application of the deployment of force is so situational, undefined, and unguided that the kind of harm suffered by plaintiff was entirely foreseeable and patently predictable.

87. Accordingly, the Court should hold that the City is subject to direct liability under <u>Monell</u>.

WHEREFORE, plaintiff demands against defendants and each of them, jointly and severally:

A. Compensatory damages in the amount to be determined by a jury;

B. Punitive damages against the individual defendants and not the governmental defendants in an amount to be determined by a jury;

C. Legal fees, other professional fees, and costs incurred in this action;

D.  Any other relief the Court deems just and proper under the facts of the case in

plaintiffs' favor.

## **JURY DEMAND**

Plaintiff requests a trial by jury pursuant to Federal Civil Rule 38.

Dated: November 30, 2021                   /s/ Michael S. Kimm
                                          Michael S. Kimm, Esq.
                                          KIMM LAW FIRM
                                          333 Sylvan Ave., Suite 106
                                          Englewood Cliffs, NJ 07632
                                          201-569-2880
                                          *Attorneys for plaintiff*