UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
HYUNJUNG KI,                                     :
                                                 :
                              Plaintiff,         :        REPORT AND
                                                 :        RECOMMENDATION
               -against-                         :
                                                 :        No. 20-CV-04343-ARR-JRC
CITY OF NEW YORK, DERMOT SHEA, as NYPD           :
Commissioner, HYUN KIM, in his individual and    :
official capacity as an NYPD Officer, and JUNG KIM, :
individually and in his official capacity as an NYPD :
Officer,                                         :
                                                 :
                              Defendants.        :
-------------------------------------------------------------------x

JAMES R. CHO, United States Magistrate Judge:

On September 16, 2020, plaintiff, Hyunjung Ki ("plaintiff"), brought this action for

monetary damages against defendants, the City of New York ("the City"), New York City Police

Department ("NYPD") Commissioner Dermot Shea ("Commissioner Shea"), NYPD Officer

Hyun Kim, and NYPD Sergeant Jung Kim. *See* Compl., Dkt. 1 ("Compl."). Plaintiff alleged

violations of 42 U.S.C. § 1983 and multiple state law torts. *See id*.

Currently before this Court, on referral from The Honorable Allyne R. Ross, is plaintiff's

motion for leave to file a Second Amended Complaint to assert a claim against the City under

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ("*Monell*"). *See* [proposed] Second

Amended Complaint ("SAC"), Dkt. 55; Pl.'s Mot. for Leave to File Second Am. Compl., Dkt. 60

("Pl.'s Mot." or "motion"). The City opposes the motion. *See* Dkt. 61 ("City's Opp."). For the

reasons discussed below, this Court respectfully recommends denying plaintiff's motion for

leave to file a Second Amended Complaint.

## I.  Background

### A.      Factual Background

The following facts are largely taken from plaintiff's motion and [proposed] Second

Amended Complaint.  *See* Pl.'s Mot., Dkt. 60; SAC, Dkt. 55.  This Court adopts these facts as

true solely for the purposes of evaluating the instant motion; however, the following are not

findings of fact by this Court.

Defendant Hyun Kim ("Officer Kim") is an officer in the NYPD.  *See* SAC ¶ 6.

Defendant Jung Kim ("Sergeant Kim") is an NYPD Sergeant and Officer Kim's superior officer.

*See id.* ¶ 2.  On October 8, 2019, plaintiff began working as a server at the Apple Tree Café ("the

Café"), a karaoke bar, in Flushing, New York.  *See id.* ¶¶ 11-12.  At approximately 10:00 p.m.

that day, Officer Kim and Sergeant Kim (collectively, the "defendant officers"), both in plain

clothes, came to the Café and were seated in a small, private room in the basement, where they

began to consume alcohol.  *See id.* ¶¶ 12-13.  Plaintiff and another server were assigned to serve

the defendant officers' private room.  *See id.* ¶ 12.  At some point that night, the defendant

officers exposed their service pistols to plaintiff.  *See id.* ¶ 13.  The sight of the firearms

disturbed both plaintiff and her fellow server.  *See id.*

Plaintiff alleges that, at a later point that night in the private room at the Café, Officer

Kim grabbed plaintiff's hand and arm and forced plaintiff to feel the gun in his holster.  *See id.* ¶

14.  Plaintiff's co-worker asked the defendant officers whether they were gang members, and in

response they identified themselves as police officers.  *See id.*  Officer Kim subsequently asked

plaintiff to bring in a co-worker named or nicknamed "Jinko."  *See id.* ¶ 15.  Plaintiff did not

know of "Jinko," but mentioned that she would leave the room to inquire.  *See id.*  Officer Kim

restrained plaintiff, preventing her from leaving the room, and retrieved his gun.  *See id.*  Officer

Kim continued to prevent plaintiff from leaving when another waiter, who had entered the room, offered to take plaintiff away from the room.  *See id.* ¶ 16.

At this point, Officer Kim's behavior became more verbally and physically aggressive. *See id.* ¶¶ 17-22.  He yelled repeated expletives directed at plaintiff and banged his gun against the table, causing bullets to fall out.  *See id.* ¶¶ 17-19.  Sergeant Kim, who had briefly stepped out of the room, re-entered at this time and told Officer Kim:  "[A]s my subordinate officer I am ordering you to put the gun away."  *See id.* ¶¶ 20-21.  Officer Kim failed to heed the request, and, according to plaintiff, Sergeant Kim failed to take meaningful follow-up action.  *See id.* ¶ 21.

After this exchange, plaintiff's co-worker re-entered the room and observed Officer Kim pointing his gun at the side of plaintiff's head.  *See id.* ¶ 22.  Officer Kim shifted his aim to the co-worker, who quickly left the room and went to inform the manager to call the police.  *See id.* The manager, who was also the Café owner, came to the private room to inform the defendant officers that the police had been called.  *See id.* ¶ 23.  The defendant officers soon left the Café. *See id.*

### B.    Procedural History

#### 1.    Prior Filings

On September 16, 2020, plaintiff commenced this action alleging the following:  (1) federal civil rights claims under 42 U.S.C. § 1983 against Officer Kim and Sergeant Kim in their individual and official capacities for false arrest by force, false imprisonment, and unreasonable seizure; (2) a tort claim against the City for negligent hiring; (3) tort claims against the City and Commissioner Shea (collectively, the "City defendants") for negligent training and supervision of law enforcement officers; (4) a tort claim against the defendant officers for reckless or

negligent infliction of emotional distress; and (5) a tort claim against the defendant officers for "menacing and/or harassment." *See* Opinion & Order ("Opinion') (Dkt. 48) at 3, 4 n.2.

On April 14, 2021, Sergeant Kim answered the Complaint and filed a cross claim for indemnification against the City. *See* Ans. to Compl., Dkt. 18.  On July 1, 2021, the City defendants moved to dismiss for failure to state a claim.  *See* Dkt. 34.

On September 24, 2021, in response to a request in plaintiff's opposition to the motion to dismiss, the Court granted plaintiff leave to submit a proposed amended complaint.  *See* Dkt. entry dated September 24, 2021.  In response to the Court's Order, on October 5, 2021, plaintiff filed a [proposed] First Amended Complaint.  *See* [proposed] First Am. Compl., Dkt. 44.

### 2.     Opinion & Order dated October 21, 2021

On October 21, 2021, the Court granted in part and denied in part both the City defendants' motion to dismiss and plaintiff's motion for leave to amend.  *See* Opinion, Dkt. 48, at 1.  Finding that Officer Kim and Sergeant Kim, while off-duty at the time of the October 8, 2019 incident, were acting under "color of law," the Court denied the City defendants' motion to dismiss plaintiff's three § 1983 claims against the defendant officers in their individual and official capacities.  *See id.* at 5-9.  The Court granted the City defendants' motion to dismiss plaintiff's tort claims for negligent hiring, training, and supervision based on insufficient factual allegations.[1]  *See id.* at 9-11.

The Court granted plaintiff's motion to amend insofar as her First Amended Complaint ("FAC") included "additional information and further specificity" in support of the Section 1983 claims.  *See id.* at 14.  As for the tort claims for negligent hiring, training, and supervision, however, since "the [FAC] contain[ed] no additional allegations" pertinent to those claims, the

---

[1] As these state tort claims were the only claims plead against the City and Commissioner Shea, the dismissal of these claims removed the City and Commissioner Shea from this action.

Court denied plaintiff leave to amend to reassert those claims on futility grounds.  *See id.* at 13-15.  The Court further held that the dismissal of the negligent hiring, training, and supervision claims was with prejudice, thereby precluding both this attempt and any future attempt by plaintiff to reassert those claims in an amended complaint.  *See id.* at 14-15.

In a subsequent order on October 29, 2021, at the request of plaintiff, the Court clarified that the October 21, 2021 Opinion dismissed all active claims against the City and Commissioner Shea.  *See* Dkt. entry dated October 29, 2021.  The Court further found that plaintiff could have, but had not as of that time, asserted a Section 1983 claim in the Complaint for municipal liability based on "policy or custom" against the City under *Monell*.  *See id.*

### 3.    Pending Motion for Leave to Amend

In the instant motion, plaintiff seeks leave to file a Second Amended Complaint to add a Section 1983 municipal liability claim -- a *Monell* claim -- against the City and the NYPD based on "official policy, custom, practices, and usages of the City" effectively authorizing the kind of excessive force used against plaintiff.  *See* SAC at ¶¶ 59-61 (Dkt. 55).  The City objects.  *See* City's Opp., Dkt. 61.  The City argues that plaintiff's SAC (1) would be futile because it fails to state a municipal liability claim against the City; (2) violates the October 21, 2021 Opinion by reasserting the dismissed negligent hiring, training, and supervision claims; (3) improperly names defendant Commissioner Shea, and that to the extent Commissioner Shea remains a party to this action, plaintiff's claims against him fail because he was not NYPD Commissioner until after the date of the alleged incident; and (4) contains a futile proposed claim against the NYPD because the NYPD is a non-suable entity.  *See id.*

## II.  Legal Standards

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, the court should grant leave

to amend "when justice so requires."  Nonetheless, leave to amend is within the court's discretion and may be denied "for good reason, including futility."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (internal citation omitted).  While a court should be lenient in granting leave to amend and deeming an amendment "futile" is undoubtedly an extreme outcome, "[a]n amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6) [for failure to state a claim]." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). Thus, any amended complaint must, at a minimum, contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  More precisely, the amended complaint must "state a claim to relief that is plausible on its face," meaning that the amended complaint must include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### III.  Discussion

#### A.    Plaintiff's Expert Report

On March 29, 2022, plaintiff submitted a purported expert report for this Court's consideration in deciding upon the motion for leave to file an amended complaint.  *See* Dkt. 62. The City objected and requested that this Court disregard the expert report when considering plaintiff's motion to amend.  *See* Dkt. 63.

When a district court decides upon a Rule 12(b)(6) motion for failure to state a claim, it "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, [] documents incorporated by reference in the complaint," or other documents on which the complaint heavily relies.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.

2010).  Since a court's consideration of a Rule 15(a)(2) motion for leave to file an amended complaint mirrors a Rule 12(b)(6) analysis insofar as the court must determine whether an amendment is "futile," the scope of information on which a court may rely to decide a Rule 15(a)(2) motion likewise mirrors that which a court can consider on a Rule 12(b)(6) motion:  "A court may not 'rely on a matter outside the pleadings'" in deciding whether to grant leave to file an amended complaint.  *See Perez v. 117 Avenue of the Americas Food Corp.*, No. 15-CV-8151, 2016 WL 5415090, at *3 (S.D.N.Y. Sept. 27, 2016) (quoting *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000)).

Here, since plaintiff's purported expert report is not incorporated by reference into plaintiff's SAC, this Court cannot consider the contents of the report on the instant motion for leave to file an amended complaint.  *See Jannazzo v. United States*, No. 15-CV-3506, 2016 WL 1452392, at *4 (E.D.N.Y. Apr. 13, 2016) (quoting *McMillan v. New York State Bd. of Elections*, No. 10-CV-2502, 2010 WL 4065434, at *4 (E.D.N.Y. Oct. 25, 2010)) ("[A]t the motion to dismiss phase of a civil case, documentary evidence, such as facts contained in an expert report, generally will have no bearing on the trial judge's consideration of the 'pure legal question' before it. . . . [U]nless this motion is to be converted to one for summary judgment . . . the Court's focus must remain trained on the four corners of the amended complaint.").

Moreover, even if the law did permit this Court to consider plaintiff's purported expert report and it was, in fact, taken into consideration, this Court would find the report immaterial for purposes of plaintiff's instant motion for leave to amend.  The purported expert report would attest to:  (1) official NYPD policies involving the use of firearms that defendants allegedly violated; (2) the NYPD's alleged failure to adequately define "excessive" force; and (3) the NYPD's alleged failure to train its officers with respect to the use of force in interactions with

the public.  *See* Pl.'s Letter, Dkt. 62, at ECF pages[2] 4-8.  Only the information in category (1) would add any additional substance to plaintiff's SAC.  Further, if it were true that "[NYPD's] policies regarding the retrieval of a service weapon . . . would have clearly prohibited [defendants' conduct]," plaintiff's expert report would in fact work *against* her attempt to plead a *Monell* claim.  *See id.* at ECF pages 7-8.  The expert report would suggest that, to the extent policies adopted by municipal policymakers governed defendants' conduct, those policies could not in fact have caused plaintiff's injuries.  *See* Parts III.B, III.B.1, below.

### B.    Plaintiff's *Monell* Claim Would Be Futile

The federal civil rights cause of action, 42 U.S.C. § 1983, applies to "person[s]" responsible for deprivations of constitutional rights under the "color of any [state] statute, ordinance, regulation, custom, or usage."  Municipalities can be "persons" under this statute but cannot be held liable under a *respondeat superior* theory of liability.  *See Monell*, 436 U.S. at 690-91.  Rather, their liability must derive from an official policy or custom.  *See id.*  To state a claim for municipal liability under 42 U.S.C. § 1983 a plaintiff must show the existence of "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 490 (E.D.N.Y. 2018) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010).  Where, as here, the allegations could amount to a violation of constitutional rights, at least for the purposes of surviving a motion to dismiss, if perpetrated under the color of state authority,[3] there are two prongs of analysis for which a plaintiff must plead sufficient facts in

---

[2] Cites to "ECF page" refer to the page number assigned by the Electronic Case Filing ("ECF") system.
[3] The unprovoked use of excessive force to achieve false imprisonment alleged in the case at bar, effectively amounting to a police officer holding an innocent civilian hostage at gunpoint without any related legitimate government interest, amounts to a sufficient claim of a Fourth Amendment violation under the *Iqbal* and *Twombly* standard.  *See Graham v. Connor*, 490 U.S. 386, 395

order to survive a Rule 12(b)(6) motion to dismiss: (1) official policy or custom, and (2) causation.

The City argues that plaintiff's SAC attempts to plead a *Monell* claim based on the allegation that there is a municipal policy or custom involving the use of excessive force, but fails to set forth adequate allegations that such a policy exists or that there is a causative link between such a policy and the events at issue. *See* City's Opp. at 5. Plaintiff argues that her SAC sufficiently supports municipal liability. *See* Pl.'s Mot. at 7-10. As the Court understands from plaintiff's motion, plaintiff alleges that the following are official policies or customs for which the City may be held liable: (1) a policy or custom of officer self-regulation (and indulgence in gratuitous use of force) arising from the City's failure to set the boundaries of "excessive force;" (2) failure-to-train officers on the use of force by nature of failing to clearly define this term; (3) a policy or custom of officer engagement in force-escalation or failure to de-escalate situations to avoid the use of force; and (4) failure-to-train officers in appropriate methods and techniques for avoiding force-escalation and pursuing force de-escalation. *See id.* at 7; SAC ¶¶ 59-87.

### 1.    Official Policy or Custom

"A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by

---

(1989) ("[We] hold that *all* claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). The scope of unreasonable "seizures" encompassed by the Fourth Amendment's prohibition includes acts where an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The Fourth Amendment has been incorporated against the states via the Fourteenth Amendment. *See Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961).

municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates." *Gem Fin. Serv.*, 298 F. Supp. 3d at 490.

Plaintiff does not allege that any formal policy or statement of an official policymaker is directly responsible for sanctioning the kind of officer misconduct alleged in the event at issue. Nor does plaintiff explicitly specify which theories of municipal liability under *Monell* she *is* trying to plead.  As the Court understands plaintiff's proposed Second Amended Complaint, plaintiff emphasizes that the official policies and procedures that do exist have left open a void in failing to sufficiently guide or train officers as to the use of force and when it becomes "excessive."  *See* SAC ¶¶ 62-86.  This void has allegedly been filled by improper police practices so widespread that they have crystallized into official customs of which City policymakers must be aware.  *See id*.  From this Court's reading, plaintiff's Second Amended Complaint does not sound in a theory that the City failed to supervise officer compliance with best practices, but rather attests to the City's insufficient policies and procedures in the first place.  Based upon this reading of plaintiff's Second Amended Complaint, this Court understands that plaintiff is attempting to plead two different pathways to municipal liability:  (1) a persistent and widespread municipal practice arising to a de-facto custom of which policymakers must be aware; or (2) the municipality's failure to adequately train its officers. The Court addresses each of these approaches in turn.

### a.    Widespread Practice Arising to a De-Facto Custom

A plaintiff can successfully plead municipal liability under 42 U.S.C. § 1983 by showing that some longstanding and widespread practice has effectively become the "standard operating

procedure of [a] local governmental entity." *Gem Fin. Serv.*, 298 F. Supp. 3d at 491 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  To prove such a de-facto custom, the claimant must present numerous cases of similar acts.  *Id*. at 491-92 (citing cases).  Moreover, the number of instances of similar conduct necessary to allege the development of a policy or custom within any given police department is "*relative to the size* of the . . . department and relative to the time frame at issue." *DiPippo v. Cty. of Putnam*, No. 17-CV-7948, 2019 WL 1004152, at *9 (S.D.N.Y. Feb. 28, 2019).  Thus, in attempting to state a *Monell* claim against the City, plaintiff's burden is heightened to account for (1) the vast size of the NYPD, and (2) the indeterminate time period over which the alleged similar acts of police misconduct occurred. *See* SAC ¶¶ 70, 73-74.

To the extent that plaintiff's broad, nebulous allegations of excessive force and escalation of sensitive situations arise to a concrete and specific custom, *see id.* ¶¶ 66-70, 77, the SAC presents only three examples of broadly-defined non-de-escalation or active escalation within the NYPD.  *See* SAC ¶¶ 70, 73-74.  While "[t]here is no set number of incidents that make a practice 'widespread,'" *Gem Fin. Serv.*, 298 F. Supp. 3d at 491, "two, three, or even four incidents" by actors below the policymaking level will likely not support an inference that a specific policy or custom related to either officer self-regulation or escalatory practices has arisen.  *See Norton v. Town of Islip*, No. 12-CV-4463, 2016 WL 264930, at *7, *7 n.10 (E.D.N.Y. Jan. 21, 2016).

Moreover, the broader the practices comprehended in the pleaded policy, "the greater the factual allegations that are required to render it plausible." *Patterson v. City of New York*, No. 16-CV-3525, 2017 WL 3432718, at *14 (E.D.N.Y. Aug. 9, 2017) (quoting *White v. City of New York*, 206 F. Supp. 3d 920, 937 n.2 (S.D.N.Y. 2016)); *see also Colon v. City of New York*, Nos. 09-CV-8, 09-CV-9, 2009 WL 4263362, at *1-*2 (E.D.N.Y. Nov. 25, 2009) (explaining that

specific enumerated customs detailing particular police behaviors against specific kinds of individuals, for which six cases involving repeated occurrences of such wrongful conduct were cited, were barely enough to "nudge[] [plaintiffs'] claims [of a de-facto custom] across the line from conceivable to plausible.").

A plaintiff must provide a large quantity of examples that are sufficiently similar to each other.  As in *Patterson*, where the court dismissed a crime victim's allegations that a broad policy of NYPD favoritism toward and assistance of Jewish crime suspects caused a state-created danger due process violation, plaintiff here "lodges generalized accusations" of similar excessive-force conduct which manifest "in a form that varies from case to case."  *Patterson*, 2017 WL 3432718, at *14-*15 ("Plaintiff has failed to substantiate [allegations of unofficial custom] . . . or to connect them to the particular misconduct alleged in this case.").

Moreover, this Court cannot "take judicial notice of a number of highly-publicized episodes of alleged police abuse or brutality, assume without any evidentiary record that these episodes all involved wrongful police behavior . . . and extrapolate from those assumptions an effect on the present episode."  *Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *21 (S.D.N.Y. Nov. 29, 2004).

Plaintiff's allegations against the City, and even the few case studies that are cited, are almost wholly derived from contents of the NYPD's "Policies and Practices Report."  *See* SAC ¶¶ 65, 70-76.  The case studies, on which the Policies and Practices Report relies for its conclusions about escalation of force, are highly publicized examples of police misconduct for which plaintiff does not provide an independent evidentiary record.  *See id.* ¶¶ 75-76; *Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, at *6 (E.D.N.Y. Sept. 22, 2017) (quoting *Peterec v. City of New York*, 2015 WL 1027367, at *7 (S.D.N.Y. Mar. 6, 2015))

("Plaintiff's reliance on reports and articles regarding misconduct by NYPD officers are 'inadequate to allege a policy or custom of the City.'").  Nor does plaintiff's SAC allege that any of the "[s]ubstantiated [Civilian Complaint Review Board] [c]ase [s]tud[ies]" on which plaintiff relies have resulted in either an admission of fault or finding of liability against the City.  *See* SAC ¶¶ 70, 73-74; *White*, 206 F. Supp. 3d at 938 ("[O]nly one of the incidents [of NYPD misconduct] has generated a lawsuit . . . and none [has] resulted in an admission or finding of liability.").

Even if taken at face value and in their most negative light, the instances of NYPD misconduct presented in plaintiff's SAC are insufficient to support the alleged policies of excessive force and non-de-escalation or active escalation.  In *Giaccio v. City of New York*, the Second Circuit held that a persistent or widespread New York City municipal policy of general unauthorized disclosure of drug test results could not be established with "only four examples where the defendants might have disclosed positive drug test results."  308 F. App'x. 470, 472 (2d Cir. 2009).

Likewise, in *White*, the court found that six instances of wide-ranging NYPD conduct over the course of five years failed as a matter of law to make plausible an alleged broadly-defined widespread NYPD practice of abusing transgender persons.  206 F. Supp. 3d at 937-38; *see also Jones v. Town of East Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (evidence of two or three instances of racially-based abuse over several years in a police department significantly smaller than the NYPD "fell . . . far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities").  The limited examples of law enforcement misconduct provided by plaintiff might be sufficient to plausibly allege widespread practices within a police department much smaller than the NYPD, *see Ferrari v. Cty. of Suffolk*, 790 F.

Supp. 2d 34, 46 (E.D.N.Y. 2011) ("[t]hree instances [of hearing officers' misconduct] . . . permit a plausible inference of a widespread practice or informal custom within Suffolk County"), or perhaps when the practices are very narrowly-defined and consist of specific behaviors, *e.g.*, "wrongfully arresting minority individuals on the pretext that they were involved in drug transactions" or "manufacturing evidence against individuals allegedly involved in drug transactions." *Colon*, 2009 WL 4263362, at *1.

Here, plaintiff's allegations fall far short of plausibly establishing the existence of broadly-defined widespread practices, amounting to "policy" of excessive force resulting from officer self-regulation or escalatory usage of force. Plaintiff's alleged practices may manifest in countlessly different ways, especially within a police department as large as the NYPD.

### b.    Failure-to-Train[4]

A municipality's failure to train its officers can only amount to municipal liability where it reflects a deliberate indifference to citizens' rights. *See Simms v. City of New York*, 480 F. App'x. 627, 629 (2d Cir. 2012) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Only when, "in light of the duties assigned to specific officers" a *particular training deficiency*, "likely to result in the violation of constitutional rights," becomes obvious to city policymakers, can policymakers be said to have been "deliberately indifferent" if they fail to act. *See City of Canton*, 489 U.S. at 390, 390 n.10; *see also Amnesty America v. Town of West*

---

[4] This Court notes that plaintiff does not allege that the City failed to supervise its officers in general or the specific officers involved in this incident by neglecting to implement established policies, failing to adopt procedures to deal with complaints against officers, or failing to investigate its officers. *See Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328-32 (2d Cir. 1986) (failure to implement procedures to deal with complaints or adequately investigate those complaints); *Vann v. City of New York*, 72 F.3d 1040, 1050-51 (2d Cir. 1995) (failure to monitor problematic officers); *H.H. v. City of New York*, No. 11-CV-4905, 2017 WL 3396434, at *8-*9 (E.D.N.Y. Aug. 7, 2017) (failure to adequately investigate and supervise a specific officer). Rather, plaintiff alleges a general failure of the City to provide adequate training in the first place in the areas of excessive force and escalation of force.

*Hartford*, 361 F.3d 113, 129-30 (2d Cir. 2004); *Dorsainvil v. City of New York*, No. 19-CV-2323, 2020 WL 7249310, at *5 (E.D.N.Y. Aug. 31, 2020). Moreover, the specific training deficiency "must be closely related to the ultimate injury" because opening the doors to more liberal failure-to-train theories would veer too close to *respondeat superior* liability for municipalities. *See City of Canton*, 489 U.S. at 391-92; *Amnesty America*, 361 F.3d at 130.

Plaintiff alleges only one specific deficiency in the City's officer training programs that policymakers should have known to remedy: the City's failure to adequately "define and contextualize force and the use of force, excessive force, and unreasonable force" for purposes of training officers. *See* SAC ¶ 66.

For the purposes of this motion, this Court assumes that plaintiff's claim that the City failed to set forth policies on such broad concepts and train officers thereon to be a claim of a *specific* training deficiency. *See Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415, 441 (2d Cir. 2009) (finding a "fundamental flaw" in the training process constituting a "specific training deficiency"). For purposes of this motion, this Court further assumes (1) that broad standards governing the use of force are not merely aspects of common sense once officers have undergone basic police training, *see Connick v. Thompson*, 563 U.S. 51, 64-65 (2011) (rejecting *Monell* failure-to-train argument that a municipality failed to train its prosecutors on their *Brady* obligations because prosecutors can glean such information from law school, continuing-education requirements, and on-the-job experience); and (2) that sufficient use-of-force guidelines cannot be understood by clear inference from the NYPD's Patrol Guide. *See* SAC ¶ 83 ("Members of the service are reminded that their conduct, on or off duty, is subject to scrutiny."); *cf. Green v. City of New York*, 465 F.3d 65, 82 (2d Cir. 2006) ("[T]he City did not fail to fulfill any training obligation it may have had. It provided personnel with guidelines that

specifically and clearly informed them that they had to evaluate non-verbal refusals of medical treatment.").

Under these assumptions, the highly-publicized examples of police misconduct and the conclusions contained within the Policies and Practices Report mentioned in plaintiff's SAC raise a plausible inference that City policymakers were deliberately indifferent to a particular training deficiency that must have been obvious.  Particularly, City policymakers were plausibly deliberately indifferent in failing to (1) adopt use-of-force guidelines that, *inter alia*, set more discrete boundaries between permissible and "excessive" force and emphasized the importance of avoiding the use of force altogether, *see* SAC ¶ 81; and (2) train their officers to comply with such guidance.  *Cf. City of Canton*, 489 U.S. at 390 n.10 ("It could . . . be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need.").

It is not unreasonable to assume that City policymakers know that *on-duty* officers will inevitably confront highly-sensitive situations with the potential for escalatory usage of force and potentially disastrous consequences jeopardizing citizens' constitutional rights, yet failed to implement the training guidelines necessary to assist officers in such situations.  *See Green*, 465 F.3d at 80-81 (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)) ("We have described three requirements for showing that a lack of training manifests deliberate indifference. . . . First . . . the plaintiff must offer evidence from which a reasonable jury could conclude 'that a policy-maker knows to a moral certainty that her employees will confront a given situation.' . . . Next, 'the plaintiff must show that the situation either presents the employee with a difficult choice . . . or that there is a history of employees mishandling the situation.' . . .

'Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'").

But a general failure to define "excessive force" or set relevant guidelines cannot come close to explaining the defendant officers' misconduct in this case: the alleged *off-duty* and *un-provoked* false imprisonment of plaintiff in a context far afield from ordinary police duties while the defendant officers were likely intoxicated. Plaintiff's allegations only suggest that the missing training, a more definite use-of-force policy, relates to officer conduct in the kind of highly volatile situations frequently encountered by on-duty police officers in the course of their ordinary duties that might, without additional guidance, result in an unnecessary force escalation or unnecessary force implementation altogether. Such training would not address an officer's mental separation between their actions and reactions while on-duty and those while off-duty, restraining an urge to *provoke out-of-thin-air* situations wherein they use force (as opposed to *escalating* situations where some modicum of force is already being used or somewhat likely to ensue), exercising restraint while drunk, or any other nexus linking use-of-force guidelines and training for ordinary police duties to the kind of activity alleged here.

There is no indication from the examples provided in plaintiff's allegations that City policymakers would have been aware of, and deliberately indifferent toward, the need for the kind of training that would be relevant to officer restraint while *drunk, off-duty*, and in typical *social settings*. Thus, assuming for the purposes of this motion that the City failed to train its officers, plaintiff's allegations would only suggest that that failure was with respect to behaviors qualitatively different from those relevant to the case at hand.

### 2.    Causation

Even if a theory of municipal liability under 42 U.S.C. § 1983 were sufficiently pled, this

Court would be unable to recommend granting leave to amend because plaintiff's SAC lacks a causative link between any official City custom or policy and the events at issue here for many of the reasons discussed above. *See Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 404 (1997) ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that . . . the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff . . . must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."). Plaintiff's SAC does not point to any situation involving the use of force in a situation remotely similar to the facts of this case which might support the inference that the defendant officers' *off-duty* conduct flowed at all from a lack of training for *on-duty* purposes, let alone distinguishing between this potential cause and many possible intervening causes, *e.g.* alcohol, social aggressiveness towards women, etc. *Id.* at 408-09.

Moreover, plaintiff's own allegations seem to weigh against finding a causal connection between a City policy and Sergeant Kim's acts during the incident at issue. Plaintiff alleges that Sergeant Kim ordered Officer Kim "as [his] subordinate officer" to put his gun down, but Officer Kim "failed to heed" and Sergeant Kim failed to further intervene. *See* SAC ¶ 21. Plaintiff attempts to frame Sergeant Kim's failure-to-intervene as either escalatory behavior or a failure to de-escalate. *See id.* ¶ 21. This may be true, but it would be far-fetched to draw any causal link between a supposed City policy and this behavior. At a minimum, Sergeant Kim's actions in ordering Officer Kim to put down his gun demonstrate that: (1) Sergeant Kim *knew* to intervene in this situation because Officer Kim's behavior exhibited excessive force, so Sergeant Kim's behavior cannot be traced to any failure to *define* excessive force or provide guiding principles for identifying such behavior; and (2) Sergeant Kim *intervened* by asserting his superiority and

ordering Officer Kim to cease his malicious behavior, so Sergeant Kim's behavior cannot be tied to a widespread custom of failing to take de-escalatory intervening measures. *See Crews v. County of Nassau*, 149 F. Supp.3d 287, 291, 295-96 (E.D.N.Y. 2015) ("[defendant-detective] Lemma openly admitted he failed to disclose the exculpatory information . . . despite knowing that he was required to do so, and ascribed his failure to do so to caseload, tiredness, and other general excuses. . . . [I]t would have been more than reasonable for the jury to conclude that any failure to train or supervise on the part of the County was not a proximate cause of plaintiff's injuries, given that Det. Lemma unequivocally stated that he knew the proper course of action, but simply failed to take it."). Rather, plaintiff's pleadings suggest an individualized lack of fortitude on the part of Sergeant Kim to follow through with his commands by *completing* the intervention.

### C.    The City's Other Arguments

#### 1.    Counts Four, Five, and Six in Plaintiff's Second Amended Complaint Are Included in Violation of the October 21, 2021 Opinion

In the Opinion & Order dated October 21, 2021, the Court "den[ied] plaintiff leave to amend her complaint to reassert the [negligent hiring, training, and supervision] claims" brought in her Complaint. *See* Opinion at 14-15. The claims included in counts four, five, and six of plaintiff's proposed SAC are identical to the barred claims and thus in direct violation of the Court's prior order. *See* SAC ¶¶ 41-50. This Court respectfully recommends denying plaintiff's motion to amend to include counts four, five, and six.

#### 2.    Commissioner Shea is Improperly Named as a Defendant

Despite being named in the caption of plaintiff's proposed SAC, Commissioner Shea is no longer a party to this action. On October 29, 2021, the Court issued an order reaffirming the City's view that, prior to plaintiff's instant motion to amend and proposed SAC, "plaintiff ha[d]

no remaining claims against defendants City and Commissioner Shea." *See* Dkt. entry dated October 29, 2021. Plaintiff's proposed SAC does not add any plaintiffs or claims to this action except for Count Nine, plaintiff's federal civil rights claim against the City. Therefore, the Court's prior ruling as to Commissioner Shea remains intact.

Accordingly, this Court does not reach the City's additional argument that any claims against Commissioner Shea must fail because Commissioner Shea was not NYPD Commissioner as of the date of the incident forming the basis for this lawsuit. *See* City's Opp. at 4; Opinion at 11 n.3.

### 3. The NYPD Cannot be Held Liable in Count Nine of Plaintiff's Proposed SAC

Plaintiff's proposed SAC does not list the NYPD as a defendant in the caption, but identifies Count Nine of the proposed SAC as a "Section 1983 claim against the New York Police Department and the City of New York." SAC ¶ 60. The NYPD is a non-suable agency of the City and thus cannot be named as a defendant in this action. *See Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Antonetti v. City of New York*, 422 F. Supp. 3d 668, 672 (E.D.N.Y. 2017) ("[U]nder New York law, municipal agencies do not have a separate identity apart from the City."). As such, this Court respectfully recommends that plaintiff's motion for leave to amend should be denied on futility grounds insofar as the NYPD is named as a defendant.

### D. The City Is Not Precluded from Rejecting Plaintiff's *Monell* Theory of Liability

Plaintiff argues that the City, under the doctrine of judicial estoppel, is precluded from challenging its liability under *Monell* due to its alleged admission of an official policy or custom as implied from the City's silence regarding *Monell* liability in its answer to the separate

complaint filed by plaintiff's coworker (Ms. Kang) arising out of the same events.  *See* Pl.'s Mot. at 11-12.  This argument is without merit.  Ms. Kang's pleadings for her 42 U.S.C. § 1983 claims sounded in a *respondeat superior* theory and did not contain any mention of a specific City policy or custom.  *See* Pl.'s Mot. at ECF pages 18-20.  Thus, they fail to suggest that Ms. Kang was seeking municipal liability, as opposed to the individual officers' liability, and would not have warranted a denial of *Monell* liability in the City's answer to the complaint.  Accordingly, no factual position on the issue of *Monell* liability was actually taken, nor can be implied, from the City's answer to Ms. Kang's complaint.  *See* Pl.'s Mot. at ECF pages 31-33.  The doctrine of judicial estoppel is therefore inapplicable.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)) ("'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.'").

## IV.  Conclusion

For the foregoing reasons, this Court respectfully recommends denying plaintiff's motion for leave to file a Second Amended Complaint.

A copy of this Report and Recommendation is being electronically served on counsel. Any objections to the recommendations made in this Report must be filed with The Honorable Allyne R. Ross within 14 days after the filing of this Report and Recommendation and, in any event, on or before **September 15, 2022**.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*) (discussing waiver under the former ten-day limit).

The Clerk is requested to enter this Report and Recommendation into the ECF system.

**SO ORDERED**

Dated:  Brooklyn, New York
        September 1, 2022

                                        s/ James R. Cho
                                        James R. Cho
                                        United States Magistrate Judge